| | | |
|---|---|---|
| **EL PUEBLO DE PUERTO RICO**<br>APELADA(S)<br><br>V.<br><br>**MICHAEL VÁZQUEZ LEBRÓN**<br>ACUSADA(S)-APELANTE(S) | **KLAN202400375** | *APELACIÓN*<br>procedente del Tribunal de Primera Instancia, Sala Superior de **GUAYAMA**<br><br>Caso Núm.:<br>**GLA2021G0010**<br>**GLA20210076-77 (308)**<br><br>Sobre:<br>Art. 93(d) CP; 6.05 y 6.09 LA |

Panel integrado por su presidenta, la Juez Lebrón Nieves, la Juez Barresi Ramos y la Jueza Santiago Calderón.

*Barresi Ramos*, juez ponente

### SENTENCIA

En San Juan, Puerto Rico, hoy día 30 de abril de 2026.

Comparece ante este Tribunal de Apelaciones, el señor **MICHAEL VÁZQUEZ LEBRÓN** (señor **VÁZQUEZ LEBRÓN**) mediante *Escrito de Apelación* interpuesto el 15 de abril de 2024. En su escrito, nos solicita que revisemos la *Sentencia* determinada el 15 de marzo de 2024 por el Tribunal de Primera Instancia, Sala Superior de Guayama.[1] En dicho dictamen, el foro primario condenó al señor **VÁZQUEZ LEBRÓN** a una pena de ciento cuarenta y ocho (148) años de reclusión por violación al Artículo 93 (d) del *Código Penal de Puerto Rico de 2012*, con reincidencia; veinte (20) años por violación al Artículo 6.05 de la Ley Núm. 168 de 11 de diciembre de 2019, según enmendada, mejor conocida como la *Ley de Armas de Puerto Rico de 2020* (*Ley de Armas*); y cuarenta y ocho (48) años por violación al Artículo 6.09 de

---

[1] Véase, *Sentencia*, página marcada con el número 371 del Tomo II de los autos originales.

Número Identificador:
SEN2026_____

la Ley Núm. 168-2019, para un total de doscientos dieciséis (216) años de reclusión.

Exponemos el trasfondo fáctico y procesal que acompañan a la presente controversia.

- I -

Por hechos ocurridos el 22 de febrero de 2020, EL PUEBLO DE PUERTO RICO, representado por el MINISTERIO PÚBLICO, el 18 de mayo de 2021, presentó tres (3) *Acusaciones* contra el señor VÁZQUEZ LEBRÓN imputándole la comisión de los siguientes delitos: (i) Artículo 93(d) del *Código Penal de Puerto Rico de 2012* (asesinato en primer grado); (ii) Artículo 6.05 de la *Ley de Armas* (portación, transportación o uso de armas de fuego sin licencia); y, (iii) Artículo 6.09 de la *Ley de Armas* (portación, posesión o uso ilegal de armas largas semiautomáticas)[2]. La *Acusación* sobre el Artículo 93(d) del *Código Penal de Puerto Rico de 2012* lee:

> "El imputado de delito, MICHAEL VÁZQUEZ LEBRÓN, allá en o para el día 22 de febrero de 2020 y en Guayama, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala de Guayama, ilegal, voluntaria, criminal e intencionalmente, actuando en concierto y común acuerdo con Christopher Rodríguez Ortiz, dio muerte a Ónix Virgilio Cora Vicioso, al disparar un arma de fuego en un lugar público o abierto al público con claro menosprecio de la seguridad pública. Consistente en que, a propósito, con conocimiento o temerariamente disparó un arma de fuego impactando a Ónix Virgilio Cora Vicioso, ocasionándole la muerte."[3]

Por otro lado, las *Acusaciones* sobre los Artículos 6.05 y 6.09 de la *Ley de Armas* aducen:

> "El referido imputado de delito, MICHAEL VÁZQUEZ LEBRÓN, allá en o para el día 22 de febrero de 2020 y en Guayama, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala de Guayama, ilegal, voluntaria, intencional y criminalmente, actuando en concierto y común acuerdo con Christopher Rodríguez Ortiz, portó, transportó y/o usó un arma de fuego, PISTOLA, MARCA GLOCK, MODELO 22, COLOR NEGRO Y AZUL MARINO, CALIBRE .40, NÚM. SERIE PBFV-056, sin tener una licencia de armas vigente bajo la Ley de Armas. Utilizándola para cometer el delito de Asesinato en Primer Grado."[4]

---

[2] Los días 10, 11, 20 de abril y el 13 de mayo de 2021, se celebró la vista preliminar en la cual se determinó no causa probable por los delitos imputados del Artículo 6.14 (a) de la *Ley de Armas* y del Artículo 249(b) del *Código Penal de Puerto Rico de 2012*.

[3] Véase *Acusación*, página marcada con el número 1 del Tomo I de los autos originales.

[4] Véase *Acusación*, página marcada con el número 2 del Tomo I de los autos originales.

"El referido imputado de delito, MICHAEL VÁZQUEZ LEBRÓN, allá en o para el día 22 de febrero de 2020 y en Guayama, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala de Guayama, ilegal, voluntaria, intencional y criminalmente, actuando en concierto y común acuerdo con Christopher Rodríguez Ortiz, portó, transportó y/o usó un arma de fuego, PISTOLA, MARCA GLOCK, MODELO 20C, COLOR NEGRO, CALIBRE 10MM, NÚM. SERIE UGG-618, la cual es capaz de disparar automáticamente, sin tener una licencia de armas vigente bajo la Ley de Armas. Utilizándola para cometer el delito de Asesinato en Primer Grado."[5]

El 14 de julio de 2021, se ordenó la excarcelación del señor VÁZQUEZ LEBRÓN por haber estado más de ciento ochenta (180) días en detención sin habérsele celebrado el Juicio en su Fondo.[6]

Después, el 8 de julio de 2022, el señor VÁZQUEZ LEBRÓN presentó una *Moción de Desestimación al Amparo del Debido Proceso de Ley y de la Regla 64(P) de las de Procedimiento Criminal.*[7]

Luego de varios trámites procesales, incluyendo la desinsaculación del jurado, el 6 de septiembre de 2022, comenzó la celebración del Juicio por Jurado. **EL PUEBLO DE PUERTO RICO** presentó como prueba de cargo los testimonios de varias personas, entre ellos: Christopher Rodríguez Ortiz (señor Rodríguez Ortiz)[8]; Alexander Lugo Collazo (señor Lugo Collazo); José Antonio Colón Rodríguez (señor Colón Rodríguez); José A. Colón Caraballo (señor Colón Caraballo)[9] y el agente Carlos M. León Vázquez (agente León Vázquez).[10] Incluimos un resumen de algunas de las declaraciones ofrecidas en el juicio ante el Tribunal de Primera Instancia:

### Christopher Rodríguez Ortiz

Narró que para el año 2020 residía en Salinas, Puerto Rico, en "Chunchín" con el señor Michael Vázquez Lebrón.[11] Atestiguó que tenía un punto de drogas en La Puente, y Michael siempre estaba con él mientras vendía drogas, "velando" que no aparecieran

---

[5] Véase *Acusación*, página marcada con el número 3 del Tomo I de los autos originales.
[6] Véase, *Auto de Excarcelación* y *Resolución* emitida el 19 de julio de 2021, páginas marcadas con los números 38 y 39 del Tomo I de los autos originales.
[7] El 15 de septiembre de 2022, el señor VÁZQUEZ LEBRÓN recurrió ante este Tribunal de Apelaciones clamando la revocación de la *Resolución* concretada el 16 de agosto de 2022 declarando no ha lugar su *Moción de Desestimación al Amparo del Debido Proceso de Ley y de la Regla 64(p) de las de Procedimiento Criminal.* Un panel hermano decidió denegar el auto de *certiorari*. Véase, KLCE202201037.
[8] Véase, *Minuta*, página marcada con el número 250 del Tomo II de los autos originales.
[9] Véase, *Minuta*, página marcada con el número 295 del Tomo II de los autos originales.
[10] Véase, *Minuta*, página marcada con el número 326 del Tomo II de los autos originales; *Minutas*, páginas marcadas con los números 320-322 del Tomo II de los autos originales.
[11] *Transcripción de la Prueba Oral*, pág. 5, líneas 14-19, 26-31; pág. 6, líneas 1-8.

guardias.[12] Comentó que tenía dos armas (4020C y 40-22 Glock), y una de ellas la tenía Michael, pues se turnaban mientras vendían drogas.[13] Refirió que luego de pasar cuatro o cinco horas en La Puente, Michael y él se dirigieron en dirección de Guayama a Salinas en su carro *Mirage* azul de dos puertas y en la vía principal pasaron por la barbería y el *carwash* y ahí se fijaron que estaban "Toñito" y "Killer".[14] Explicó que, estando allí, decidieron que iban a matarlos por unas riñas viejas que tenían, por lo que se trasladan a Chunchín a su casa para buscar un rifle (R-15) y regresar.[15] Declaró que una vez tenían las armas, llamó a "Toki", quien vivía frente a la casa de su hermana, para que le comunicara con Alexander Lugo, alias "Chelingo", quien era su cuñado, pareja de su hermana, para notificarle que lo esperara en la fábrica de carbón ubicada en Guayama.[16] Elucidó que posterior a esa conversación, lavaron el carro *Mirage* azul claro de cuatro puertas con bonete y bumper negro que le habían comprado a "Pin", padre de "Toki" y el cual utilizarían para matar a "Toñito" y a "Killer".[17] Aseveró que se vistieron de negro para taparse completos, incluyendo los tatuajes, y se pusieron máscaras.[18] Expresó que Michael se encontraba en el asiento del pasajero, y una vez se dirigieron a donde estaban "Toñito" y "Killer", pararon "chillando goma" frente a la pizzería, que estaba al lado del *carwash* y la barbería y Michael ya tenía la puerta abierta.[19] Manifestó que en lo que ponía el carro en "parking", Michael se bajó y comenzó a disparar y luego él se unió a Michael y comenzó a disparar con el rifle, pero se le trancó, por lo que sacó una pistola 4020C y disparó hacia "Toñito", quien ya se había ido del lugar corriendo.[20] Reveló que Michael se mantuvo disparando a las personas que estaban en el lugar, y uno de ellos que no sabían quién era, al intentar correr, se tropezó, cayó al suelo y suplicaba no le hicieran nada porque no tenía nada que ver.[21] Expuso que Michael le disparó primero cuando se tropezó y cayó, y luego cuando estaba en el piso vio como le metió un disparo en la cabeza.[22] Desplegó que luego se montaron en el carro y se fueron a la fábrica de carbón donde "Chelingo" los estaba esperando.[23] A preguntas del fiscal, contestó que no conocía al occiso Ónix Cora Vicioso.[24] Comunicó que le preguntó a Michael porque había matado a esa persona, a lo que le respondió que se había quedado con la adrenalina.[25] Depuso que luego de llegar a donde "Chelingo", se cambiaron de carro al Mazda blanco de cuatro puertas y se dirigieron hacia el monte para deshacerse de los guantes que habían utilizado y de las armas.[26] Reconoció que Michael y él le dieron la ropa negra a "Chelingo" para que él se hiciera cargo y la botara; y luego de eso se fueron a su casa en donde permanecieron de dos a tres días escondidos.[27] Hizo saber que se escondían, pues el plan era asesinar a "Toñito" y a "Killer", pero no se pudo porque Michael

---

[12] *Transcripción de la Prueba Oral*, pág. 6, líneas 21-31; pág. 7, líneas 1-5.

[13] *Íd.*, pág. 7, líneas 9-24.

[14] *Íd.*, pág. 8, líneas 4-28; pág. 9, líneas 15-21, 26-31.

[15] *Íd.*, pág. 10, líneas 13-31 pág. 52, líneas 30-31; pág. 53, líneas 1-12; pág. 54, líneas 1-2; pág. 55, líneas 4-6, 21-31; pág. 56, líneas 1-29.

[16] *Íd.*, pág. 11, líneas 6-9, 16-31; pág. 12, líneas 13-16, 23-24.

[17] *Transcripción de la Prueba Oral*, pág. 13, líneas 1-15; líneas 19-31.

[18] *Íd.*, pág. 14, líneas 3-9.

[19] *Íd.*, pág. 15, líneas 11-31.

[20] *Íd.*, pág. 16, líneas 3-4, 9-14, 16-31.

[21] *Transcripción de la Prueba Oral*, pág. 17, líneas 2-9, 17-23, 29-31; pág. 18, líneas 1-8.

[22] *Íd.*, pág. 18, líneas 9-16; pág. 74, líneas 29-31.

[23] *Íd.*, pág. 18, líneas 16-28.

[24] *Íd.*, pág. 18, líneas 29-31; pág. 30, líneas 1-6; pág. 34, líneas 28-31.

[25] *Transcripción de la Prueba Oral*, pág. 19, líneas 1-18; pág. 20, líneas 24-31; pág. 21, líneas 1-5; pág. 91, líneas 9-14, 20-26.

[26] *Íd.*, pág. 19, líneas 19-31; pág. 21, líneas 9-31; pág. 22, líneas 1-31; pág. 23, líneas 1-5.

[27] *Íd.*, pág. 23, líneas 9-29; pág. 75, líneas 20-25; pág. 76, líneas 1-5, 10.

mató al "chamaco".[28] Dilucidó que el 13 de marzo de 2020, le hicieron un allanamiento frente a casa de su hermana, él se encontraba en su vehículo y lo arrestaron por posesión de armas y drogas.[29] Las armas que le encontraron en su posesión fueron las utilizadas el día de los hechos (una negra completa 20C y una negra y azul 22).[30] Confesó que inicialmente le había comentado al Agte. Carlos León que no sabía nada sobre un asesinato ocurrido en La Puente, y posteriormente iba a hablar pero al haber pasado mucho tiempo preso, no quiso hablar con el Agte.[31] Puntualizó que volvió a ver a Michael al llegar a la cárcel de Bayamón (705), luego de radicarse el asesinato, y allí tuvo la oportunidad de hablar con él, pues pensaba que lo iba a sacar o ayudar, a lo que Michael le respondió que el caso no prosperaría.[32] Replicó que testificó en el caso porque no quería pagar por un crimen que no cometió, pues ellos planificaban matar a "Killer" y a "Toñito", pero mataron a una persona inocente, cuando en el bajo mundo no asesinan personas inocentes.[33] Apuntó que la hora aproximada del asesinato fue a eso de las 4 o 5 de la tarde. Asimismo, luego de ver el video de las cámaras de seguridad distinguió el lugar, el carro, a Michael como pasajero, la dirección en que disparaban ambos; y relató que el rifle se le trancó, por lo que sacó la pistola 40 que tenía en la cintura para continuar disparando hacia Toñito.[34]

En el contrainterrogatorio, recalcó que no se le ofreció beneficio alguno por testificar en contra de Michael, y está acusado por el asesinato.[35] Particularizó que no había sido acusado por intento de asesinato al herir a Toñito.[36] Fue confrontado con sus declaraciones anteriores al juicio, las cuales constan de una declaración jurada, y dos testimonios realizadas en la cárcel de Guayama, y en la Vista Preliminar.[37] Aclaró que no mencionó que Michael tenía un arma y se velaban mientras vendían drogas, porque nunca se lo preguntaron.[38] Avaló que en las entrevistas anteriores no le preguntaron sobre el propósito de la compra del vehículo de "Pin", y el jueves anterior no hubo una conversación con Chelingo sobre los planes que tenían el sábado luego (día del asesinato).[39] Precisó que aun cuando en la declaración jurada expresa que desecharon los guantes en el patio de su casa, lo cierto era que solo los botaron en el camino así como la máscara y las llaves en el monte.[40] Exteriorizó que realizó aproximadamente uno o dos disparos con el rifle aunque en su declaración jurada mencionó que fueron cuatro disparos, y esclareció que de tres disparos no pasó porque se trancó.[41]

## Alexander Lugo Collazo

Reseñó que conocía a Christopher Rodríguez Ortiz porque era su cuñado y estudió con él desde pequeño, identificó al señor

---

[28] *Transcripción de la Prueba Oral*, pág. 24, líneas 3-17.
[29] *Íd.*, pág. 26, líneas 1-25.
[30] *Íd.*, pág. 26, líneas 26-28; pág. 27, líneas 1-21.
[31] *Íd.*, pág. 28, líneas 3-18, 26-31; pág. 29, línea 1; pág. 81, líneas 24-29; pág. 82, líneas 1-10.
[32] *Transcripción de la Prueba Oral*, pág. 29, líneas 2-26.
[33] *Íd.*, pág. 30, líneas 11-16, 23-31; pág. 31, líneas 1-9.
[34] *Íd.*, pág. 34, líneas 8-24; pág. 35, líneas 1-4, 22-27.
[35] *Íd.*, pág. 40, líneas 7-28; pág. 43, líneas 8-12; pág. 79, líneas 1-24.
[36] *Transcripción de la Prueba Oral*, pág. 42, líneas 6-15.
[37] *Íd.*, pág. 44, líneas 29-31; pág. 45, líneas 1-31; pág. 46, líneas 5-13; pág. 77, líneas 19-22, 27-30; pág. 78, líneas1-30.
[38] *Íd.*, pág. 47, líneas 28-31, pág. 48, líneas 1-13; pág. 79, líneas 27-31; pág. 80, líneas 1-11.
[39] *Transcripción de la Prueba Oral*, pág. 63, líneas 6-21.
[40] *Íd.*, pág. 64, líneas 7-20.
[41] *Íd.*, pág. 67, líneas 22-30; pág. 68, líneas 1-31; pág. 69, líneas 10-22.

Vázquez Lebrón y pues lo conocía desde el año 2020.[42] Subrayó que el día 22 de febrero de 2020, se encontraba en su casa y recibió una llamada al celular del vecino frente a su casa, "Toki", quien se lo trajo a su casa y al responder era Christopher, diciéndole que lo buscara en la fábrica de carbón.[43] Continuó que una vez recibió la llamada de Christopher, se fue en el carro Mazda Protege blanco de cuatro puertas y esperó en la fábrica unos doce a quince minutos.[44] Acentuó que estando allí, esperó de 12 a 15 minutos, y luego vio un carro acercarse de color gris y verde con bumper y bonete negro perteneciente a "Pin".[45] Una vez llega el vehículo, se bajaron Michael (quien venía de pasajero) con un arma negra y azul marino y Christopher (quien venía guiando) con un rifle de color negro y gris, y una "corta" (pistola negra) ambos con *jackets* y *hoodies* negros, y guantes; se montaron en su carro y olían a pólvora.[46] Enfatizó que Christopher iba de pasajero en su carro y Michael iba en la parte de atrás; a Christopher se le había quedado encajado un casquillo en la pistola, Michael estaba cambiando el peine y poniendo otro; Michael tenía unas pintitas de sangre en los guantes.[47] Detalló que se metieron por un desvío; Christopher le daba instrucciones de por donde manejar; pararon en un monte en donde Christopher y Michael se bajaron para deshacerse de las armas; después los llevó a ambos a casa de Christopher en Chunchín, en Salinas, y luego se fue a su casa.[48] Una vez los dejó, pasó por el *carwash* y la barbería; habían muchos guardias; ese *carwash* y barbería era de "Toñito" y "Killer"; sospechó habían sido Christopher y Michael porque eran los únicos que tenían problemas con ellos.[49] Resaltó que estando en su carro, Christopher le reclamaba a Michael el haber matado a la persona que no era; Michael le arguyó que ellos eran los que mandaban ahí; dispuso de la ropa que tenían puesta en un mangle en Guayama cerca de La Puente, dentro de una bolsa negra.[50] Despuntó que el 14 de marzo de 2020, hubo un allanamiento en su casa y le encontraron un "tuquito" de marihuana.[51] Señaló que al recoger su vehículo en la comandancia, le enseñó a "Bolita" (Agte. León) una foto de Michael desde su celular, de un *friend request* que le había enviado a la que era su pareja antes, pues él sabía que era quien había sido parte del asesinato ocurrido.[52] Le indicó a "Bolita" donde se encontraba la ropa de la que dispuso, fueron al mangle cerca de Pozuelo juntos y la sacaron.[53] Examinó los *exhibits* presentados y reconoció el carro Mitsubishi que estaba frente a su casa como el carro que venía manejando Christopher con Michael; así como la ubicación de la barbería/*carwash* propiedad de "Toñito" y "Killer".[54] Aseguró que ya había visto las armas con anterioridad, toda vez que frente a su casa había un punto de drogas operado por Christopher y Michael, quienes siempre las portaban encima de su cuerpo;

---

[42] *Transcripción de la Prueba Oral*, pág. 108, líneas 17-30; pág. 109, líneas 6-16; pág. 16-19.

[43] *Íd.*, pág. 109, líneas 17-25; pág. 110, líneas 2-6, 12-30; pág. 111, líneas 1-7; pág. 154, líneas 4-14.

[44] *Íd.*, pág. 111, líneas 16-25; pág. 112, líneas 13-20; pág. 135, líneas 1-9, 23-30.

[45] *Íd.*, pág. 112, líneas 22-31; pág. 136, líneas 12-20.

[46] *Transcripción de la Prueba Oral*, pág. 113, líneas 16-30; pág. 114, líneas 3-31; pág. 115, líneas 6-31; pág. 116, líneas 4-24; pág. 117, líneas 9-12; pág. 138, líneas 25-29.

[47] *Íd.*, pág. 116, líneas 23-31; pág. 117, líneas 17-30; pág. 118, líneas 1-5.

[48] *Íd.*, pág. 118, líneas 27-29; pág. 119, líneas 1-3, 8-16; pág. 120, líneas 10-23, 28-31; pág. 121, líneas 5-23.

[49] *Íd.*, pág. 121, líneas 26-31; pág. 122, líneas 3-18.

[50] *Transcripción de la Prueba Oral*, pág. 122, líneas 20-31; pág. 123, líneas 4-19, 23-30; pág. 170, líneas 23-30; pág. 171, líneas 1-31; pág. 172, líneas 19-31; pág. 173, líneas 7-17.

[51] *Íd.*, pág. 124, líneas 9-20.

[52] *Íd.*, pág. 125, líneas 4-14; pág. 126, líneas 1-2, 10-28; pág. 133, líneas 13-26; pág. 182, líneas 21-30; pág. 183, líneas 3-29.

[53] *Íd.*, pág. 126, líneas 29-30; pág. 127, líneas 1-14; pág. 128, líneas 2-6, 20-30; pág. 129, líneas 1-4.

[54] *Íd.*, pág. 129, líneas 5-23; pág. 131, líneas 7-26.

especificó que Christopher utilizaba la automática y Michael la semi automática de color azul marino y negro.[55] Describió que el físico de Christopher era más flaco y alto, y Michael era más "chiquito" y más "gordito" que Christopher.[56] Reiteró que no se le ha ofrecido beneficio alguno a cambio de su testimonio.[57]

En el contrainterrogatorio, repitió que el día de los hechos recibió una llamada a través del teléfono de Toki; negó que el jueves antes habló con Christopher para "hacer una vuelta" el sábado (día de los hechos); concretó que desde el inicio omitió detalles sobre lo ocurrido pues tenía miedo que lo involucraran porque usó su carro.[58] Acreditó que el carro de Christopher lo había comprado dos semanas antes de la fecha de los hechos, pero que no conocía para que se utilizaría.[59] Atestó que Michael tenía un *jacket* gris y un pantalón negro; y nunca se quitó la máscara; y cuando habló con el Agte. León nunca dijo que Michael estaba en el carro.[60] Refrendó que observó quien tenía la máscara puesta, y tenía unos guantes azules de hospital con manchas de sangre.[61]

### José Antonio Colón Rodríguez

Manifestó que se le conocía por el apodo de "Toki" y residía en Guayama, en el área de Miramar.[62] Divulgó que conocía a Christopher a través de su hermano y de la hermana de Christopher, pues ésta era pareja de "Chelingo" para el 2020 y residían frente a su casa.[63] Profirió que el 22 de febrero de 2020, recibió una primera llamada de un número desconocido que no contestó, y luego recibió una segunda llamada, la cual sí respondió y le dijeron que le pasara el teléfono a "Chelingo", a lo que el preguntó quién era, pero no recibió contestación hasta que al final le dijeron que era Christopher.[64] Apuntó que al la persona identificarse como Christopher, fue a donde "Chelingo", quien se encontraba al frente de su casa y le notificó que lo estaban procurando.[65] Comentó que "Chelingo" se fue para dentro de su casa con su teléfono, luego le regresó el teléfono y "Chelingo" pronto se fue en un Mazda blanco como a eso de las 4:00PM o 5:00PM.[66]

Afianzó que entre la primera y la segunda llamada transcurrieron aproximadamente treinta (30) minutos a eso de las 4:40PM.[67] Aseveró que ese mismo día, "Chelingo" llegó "normal" como a eso de las 6:00PM en el Mazda.[68] Informó que fue entrevistado por el Agente León y su declaración fue firmada por su padre.[69] Posterior a los hechos, dejó de hablar con Christopher, por lo que ocurrió con el carro que le compró a su papá.[70]

---

[55] *Transcripción de la Prueba Oral*, pág. 136, líneas 28-31; pág. 137, líneas 1-9, 14-31; pág. 138, líneas 1, 14-29.

[56] *Íd.*, pág. 139, líneas 6-10; pág. 140, líneas 26-28; pág. 141, líneas 2-23.

[57] *Íd.*, pág. 143, líneas 3-5; pág. 149, líneas 24-27.

[58] *Íd.*, pág. 145, líneas 25-31; pág. 146, líneas 1-7, 18-31; pág. 150, líneas 18-30; pág. 153, líneas 9-23; pág. 167, líneas 15-26; pág. 169, líneas 11-22; pág. 184, líneas 1-5.

[59] *Transcripción de la Prueba Oral*, pág. 155, líneas 13-30.

[60] *Íd.*, pág. 156, líneas 20-30; pág.157, líneas 13-18; pág. 162, líneas 6-8, 9-15.

[61] *Íd.*, pág. 164, líneas 12-19; pág. 165, líneas 7-15; pág. 166, líneas 4-14.

[62] *Íd.*, pág. 190, líneas 18-27.

[63] *Transcripción de la Prueba Oral*, pág. 190, líneas 28-31; pág. 191, líneas 1-13; pág. 193, líneas 18-31; pág. 194, líneas 1-13.

[64] *Íd.*, pág. 191, líneas 14-25; pág. 194, líneas 26-31; pág. 195, línea 1.

[65] *Íd.*, pág. 191, líneas 26-30; pág. 192, líneas 1-19; pág. 198, líneas 24-30; pág. 199, líneas 8-21.

[66] *Íd.*, pág. 192, líneas 20-31; pág. 193, líneas 1-7.

[67] *Transcripción de la Prueba Oral*, pág. 195, líneas 2-23.

[68] *Íd.*, pág. 197, líneas 22-28.

[69] *Íd.*, pág. 201, líneas 4-9, 26-30.

[70] *Íd.*, pág. 203, líneas 8-29.

## José A. Colón Caraballo

Atestiguó que lo conocen como "Pin" y residía en Comunidad Miramar.[71] Afirmó conocer a Christopher Rodríguez Ortiz desde pequeño, pues la hermana de Christopher vivía cerca de su residencia en Miramar con "Chelingo".[72] Delató que era dueño de varios vehículos, entre ellos, una S10, un Nissan Áltima y un Mitsubishi Technica y este último se lo vendió a Christopher para piezas por una deuda de $300.00 por unos aros que existía entre ambos.[73] Esclareció que el carro era azul claro, con el bonete, el guardalodos y el bumper negro.[74] Sostuvo que conocía a Michael porque era del mismo barrio y lo vio en ocho (8) ocasiones frente a la casa de la hermana de Christopher.[75] Declaró que en marzo de 2020, un oficial fue a su casa para dirigirlo al cuartel para indagar sobre el vehículo Mitsubishi Technica.[76] Identificó que el aludido vehículo, en efecto, fue el mismo que le vendió a Christopher.[77]

En el contrainterrogatorio, apuntaló que fue entrevistado por el Agente León el 16 de marzo como parte de la investigación.[78] Confirmó que en su declaración ante el Agente León nunca mencionó que conocía a Michael.[79] Enunció que el negocio de la venta del vehículo se realizó a mitad o a finales de febrero, y fue dos semanas antes del asesinato.[80]

## Agte. Carlos M. León Vázquez

Detalló que lleva trabajando veinticuatro (24) años en la Policía de Puerto Rico en diferentes divisiones y/o distritos.[81] Añadió que como agente de homicidios ha investigado aproximadamente de 250 a 300, de los cuales ha declarado entre 60 a 100 casos.[82] Contó que el 22 de febrero de 2020 se le asignó como agente investigador el caso ocurrido en el barrio Punta de Jobo donde hubo un asesinato en una pizzería/carwash/barbería.[83] Llegó a la escena a eso de las 6:30PM, investigó el perímetro con una inspección ocular, y luego amplió el perímetro, toda vez que entendía que era muy corto, y requería de más espacio para poder trabajarla.[84] Allí, vio el cuerpo de un hombre sin vida en el piso, varios casquillos, y se fijó que en el negocio de al frente había cámaras de seguridad, por lo que procedió a solicitar un *subpoena* para requerir las grabaciones. Relató que identificó al padre del occiso, el Dr. Cora.[85] Garantizó que la evidencia de la escena se identificó con números (en total 25 piezas de evidencia), y se levantó la prueba de la escena, incluyendo el cuerpo del occiso, además de los casquillos de las balas.[86] Explicó que de su investigación se identificaron tres (3) heridas de bala (una en el brazo, y dos en la

---

[71] *Transcripción de la Prueba Oral*, pág. 204, líneas 10-15; pág. 205, líneas 9-11.

[72] *Íd.*, pág. 205, líneas 12-24.

[73] *Íd.*, pág. 206, líneas 1-9; pág. 206, líneas 26-29.

[74] *Íd.*, pág. 206, líneas 10-25.

[75] *Transcripción de la Prueba Oral*, pág. 207, líneas 15-31.

[76] *Íd.*, pág. 208, líneas 1-6.

[77] *Íd.*, pág. 208, líneas 7-15.

[78] *Íd.*, pág. 209, líneas 1-6.

[79] *Transcripción de la Prueba Oral*, pág. 209, líneas 15-29.

[80] *Íd.*, pág. 211, líneas 21-27.

[81] *Íd.*, pág. 215, líneas 25-30; pág. 216, líneas 1-15.

[82] *Íd.*, pág. 216, líneas 30-31; pág. 217, líneas 1-6.

[83] *Transcripción de la Prueba Oral*, pág. 217, líneas 1-21-26; pág. 218, líneas 1-10.

[84] *Íd.*, pág. 218, líneas 12-31; pág. 219, líneas 1-5, 9-31; pág. 220, líneas 1-16, 21-31; pág. 221, líneas 1-5.

[85] *Íd.*, pág. 221, líneas 19-28.

[86] *Íd.*, pág. 223, líneas 1-4, 27-31; pág. 225, líneas 1-10; pág. 226, líneas 4-12.

espalda).[87] Señaló que según la investigación, el Dr. Cora, padre de la víctima, le dijo que ese día iban en camino al Centro Médico de Mayagüez, llamó a su hijo quien residía en Ponce para que lo acompañara a un cumpleaños; se detuvieron al barrio Puente de Jobo en Guayama para compartir con unas amistades antes de la actividad a la que iban; en un momento fue al baño del negocio frente a la Barbería y cuando salió se encontró con lo que le había sucedido a su hijo.[88] Mostrado el video, describió lo que va sucediendo: llega un vehículo de color verde o verde aqua con todo el frente negro Mitsubishi Mirage cuatro puertas; de manera abrupta se baja un individuo con un rifle en la mano, hace detonaciones y luego lo pone en el piso para sacar otra arma de la cintura; del lado del pasajero se bajó un individuo de constitución baja, ancho, vestido de oscuro completo, ambos con la cara tapada disparando; las personas que estaban ahí salieron corriendo, se quedó una sola persona en el área, quien resultó ser el joven Ónix Cora Vicioso.[89] Acreditó que surge del video que el señor Ónix Cora Vicioso cruzó a la barbería, se sentó en el escalón de la parte de al frente y luego comenzaron a disparar.[90] Reconoció que quien iba manejando el vehículo era Christopher Rodríguez Ortiz y el pasajero era Michael Vázquez Lebrón.[91] Reafirmó que, en efecto, el señor José Caraballo alias "Pin" le vendió el vehículo a Christopher.[92] Compartió sobre la conversación que tuvo con "Toñito", quien le dijo que cuando empezó a correr luego del tiroteo, pudo ver a una persona en la parte posterior del vehículo, en el asiento de atrás, a quien reconoció como "Chamil"; mas no pudo reconocer a los que se bajaron del vehículo a disparar.[93] Razonó que para confirmar dicha información, realizó un ejercicio para saber si era posible, desde donde estaba sentado "Tonito", hasta donde estaba el carro se podía ver, puesto que los tintes eran oscuros.[94] Investigó sobre "Chamil", resultó que no se encontraba en Puerto Rico, y se encontraba en Estados Unidos prófugo.[95] Aludió que obtuvo el pietaje de las cámaras de seguridad de la planta de AES; la hora del asesinato fue a las 5:35PM (el video tenía 23 minutos de retraso) y aparece una persona en el Mazda Protege blanco de cuatro puertas, una persona de tez blanca, delgado, sin ningún otro ocupante.[96] Divulgó que recibió una información que en el barrio Puente Jobo había un punto de drogas, hicieron una vigilancia; el 13 de marzo de 2020 se diligenciaron unas órdenes de allanamiento; como parte del operativo vio un carro Mazda Protege blanco estacionado encima de la acera y un Mitsubishi Mirage color azul cielo frente a la residencia con una persona adentro, por lo que procedió a observar y notó que en el asiento del pasajero, a simple vista, había un bulto de bebé color rosa y encima picadura de marihuana en unos envases.[97] En ese mismo allanamiento se ocuparon las armas que estaban en posesión de Christopher, resultaron ser una negra completa con una pieza alterada y una glock negra y azul marino.[98] Sustentó que tras el arresto, Christopher le indicó que no sabía nada sobre el asesinato;

[87] *Transcripción de la Prueba Oral*, pág. 224, líneas 10-19.
[88] *Íd.*, pág. 229, líneas 24-31; pág. 230, líneas 1-16.
[89] *Íd.*, pág. 232, líneas 5-29.
[90] *Íd.*, pág. 234, líneas 16-28; pág. 235, líneas 15-19.
[91] *Transcripción de la Prueba Oral*, pág. 236, líneas 1-18.
[92] *Íd.*, pág. 241, líneas 8-26.
[93] *Íd.*, pág. 243, líneas 11-28.
[94] *Íd.*, pág. 244, líneas 1-6, 11-31.
[95] *Transcripción de la Prueba Oral*, pág. 245, líneas 10-13.
[96] *Íd.*, pág. 247, líneas 10-31.
[97] *Íd.*, pág. 251. Líneas 25-31; pág. 252, líneas 1-11, 24-30; pág. 253, líneas 1-30; pág. 254, líneas 18-31; pág. 255, líneas 1-31; pág 256, líneas 1-11, 15-30; pág. 257, líneas 6-31.
[98] *Íd.*, pág. 259, líneas 1-2, 11-23; pág. 264, líneas 9-21.

Alexander sí habló con él sobre lo que había sucedido ese día.[99] Destacó que Alexander fue entrevistado en tres (3) ocasiones.[100] Aseguró que ese día 22 de febrero de 2020 "Toñito" y "Killer" (narcotraficantes) se encontraban en el área de Guayama, en la pizzería; Michael y Christopher siempre estaban armados con sus respectivas pistolas; cuando Michael y Christopher pasan por la pizzería ven a "Toñito" y a "Killer", y deciden que era el momento para hacer un atentado contra ellos; regresaron a buscar el rifle, limpian el carro; se preparan con ropa oscura, guantes y caretas en el Mitsubishi cuatro puertas con el frente negro; Christopher llama a Alexander para pedirle que fuera a la fábrica y lo esperara; llegaron a la pizzería en el carro, frenan, se baja Christopher por el área del chofer con el rifle pero se le tranca y saca la pistola, hiere a "Toñito"; Michael tenía la puerta abierta al llegar y se baja disparando y cuando llega al área donde está la víctima, este levanta las manos, se tropieza y en ese momento Michael le apunta y le dispara en el área de la cara o de frente y se van.[101] Refirió que en la primera entrevista de Christopher, realizada el 14 de marzo, no identificó a Michael porque tenía miedo pues en ese momento estaba detenido pero Michael seguía en la calle.[102] Concluyó que la persona que disparó con Christopher fue Michael, por su constitución física, al no parecerse a la de Alexander.[103]

En el contrainterrogatorio fue confrontado con la información que le brindó el exagente de la policía José Cotto Cosme y Toñito (quien resultó herido), sobre la alegada tercera persona que se encontraba en el carro al momento del asesinato, es decir, de "Chamil".[104] Avaló que no le mereció credibilidad esos testimonios, pues reiteró que como parte de su investigación se realizaron ciertas pruebas para comprobar que en efecto no se podía ver a una persona a esa distancia, ni una silueta.[105] Aclaró que Christopher no recibió ningún beneficio por sentarse a declarar en el juico y tampoco pidió algo a cambio.[106]

El 23 de enero de 2024, se presentó un *Pliego de Agravantes* en el cual **EL PUEBLO DE PUERTO RICO** formuló los siguientes agravantes a las acusaciones contra el señor **VÁZQUEZ LEBRÓN**:[107]

El acusado MICHAEL VÁZQUEZ LEBRÓN, utilizó un arma de fuego en la comisión del delito, consistente en que éste y en común y concierto acuerdo con otro acusado utilizó una pistola marca Glock, modelo 22, color negro y azul marino, calibre .40, número de serie PBFV-056 y una Pistola, marca Glock, modelo 20C , color negro, calibre 10 mm, número de serie UGG-618, la cual es capaz de disparar automáticamente, para cometer el asesinato de la víctima Ónix Cora Vicioso. Artículo 66 inciso (k) del Código Penal y Regla 171 (A) (b) de las de Procedimiento Criminal.

---

[99] *Transcripción de la Prueba Oral*, pág. 270, líneas 19-31; pág. 271, líneas 1-30; pág. 272, líneas 1-31; pág. 273, líneas 1-31.

[100] *Íd.*, pág. 274, líneas 20-22; pág. 411, líneas 5-18.

[101] *Íd.*, pág. 275, líneas 28-31; pág. 276, líneas 1-25; pág. 277, líneas 8-27; pág. 278, líneas 1-31; pág. 279, líneas 1-31; pág. 280, líneas 1-31; pág. 281, líneas 1-28.

[102] *Íd.*, pág. 292, líneas 10-19.

[103] *Transcripción de la Prueba Oral*, pág. 302, líneas 8-28.

[104] *Íd.*, pág. 352, líneas 25-30; pág. 353, líneas 1-31; pág. 354, líneas 1-14.

[105] *Íd.*, pág. 356, líneas 15-20; pág. 357, líneas 1-5; pág. 370, líneas 16-22; pág. 382, líneas 17-31; pág. 383, líneas 18-28; pág. 385, líneas 10-23; pág. 448, líneas 13-19, 20-31

[106] *Íd.*, pág. 420, líneas 1-4.

[107] Véase, *Pliego de Agravantes*, página marcada con el número 338 del Tomo II de los autos originales.

El acusado MICHAEL VÁZQUEZ LEBRÓN, causó grave daño corporal a la víctima. Consistentes dichos actos en que éste y en común y concierto acuerdo con otro acusado cometió el delito de asesinato contra la víctima Ónix Cora Vicioso. También, hirieron a Anthony Vega De Jesús C/P Toñito. Artículo 66 inciso (l) del Código Penal y Regla 171 (A) (a) de las de Procedimiento Criminal.

El delito cometido fue de violencia y su comisión revela crueldad y desprecio contra la víctima. Consistentes dichos actos en que el acusado MICHAEL VÁZQUEZ LEBRÓN, asesinó a un inocente, con conocimiento de que no era la persona contra las cuales ellos iban a llevar a cabo los actos delictivos de asesinato. Además, en la comisión de este delito, revela crueldad y desprecio contra la víctima al dispararle por la espalda. Artículo 66 inciso (o) del Código Penal y Regla 171 (A) (a) de las de Procedimiento Criminal.

El acusado MICHAEL VÁZQUEZ LEBRÓN, cometió delitos de violencia que envolvió más de una víctima. Consistentes dichos actos en que cometió el delito de asesinato contra Ónix Cora Vicioso y el delito de Tentativa de Asesinato o Agresión Grave contra Anthony Vega De Jesús C/P Tonito. Regla 171 (A) (d) de las de Procedimiento Criminal.

El 23 de enero de 2024, el Jurado encontró culpable de los delitos imputados al señor VÁZQUEZ LEBRÓN y determinó que los agravantes interpelados por EL PUEBLO DE PUERTO RICO fueron probados.[108] Así las cosas, el 15 de marzo de 2024, se decretó la *Sentencia* apelada.

Inconforme, el 15 de abril de 2024, el señor VÁZQUEZ LEBRÓN acudió ante este foro revisor mediante *Escrito de Apelación*. En su recurso, señaló la comisión del(de los) siguiente(s) error(es):

Erró el juzgador de los hechos, en este caso un Jurado, y el Tribunal de Primera Instancia, al encontrar culpable al Apelante ya que la prueba presentada por el Ministerio Público no sostiene la culpabilidad de [e]ste más allá de duda razonable.

Erró al darle credibilidad a unos testimonios inconsistentes y contradictorios sobre asuntos medulares y, sobre todo, plagados de mentiras, vertidos por los testigos principales Christopher Rodríguez Ortiz, Alexander Lugo Collazo y el [a]gente investigador Carlos M. León Vázquez. Las contradicciones e inconsistencias no permitían sostener una convicción en el presente caso.

Erró al darle credibilidad a los testigos principales, cuando la prueba del propio Ministerio Público había evidencia, de parte de un expolicía que observó una persona que no es el apelante, montado en la parte posterior del vehículo en el que se cometió el asesinato.

Erró el Jurado al no tomar con sospecha el testimonio del alegado coautor Christopher Rodríguez Ortíz, más aún cuando su testimonio estuvo plagado de contradicciones.

---

[108] Véase, *Veredicto del Jurado* y *Veredicto del Jurado-Solicitud de Imposición de Agravante*, páginas marcadas con los números 340-341 del Tomo II de los autos originales.

Erró el Tribunal de Primera Instancia y el juzgador de los hechos al no garantizar al acusado su derecho constitucional a un juicio justo e imparcial.

Erró el Tribunal de Primera Instancia y el jurado al no garantizar la presunción de inocencia del apelante y que se determinara su culpabilidad únicamente si se establecía las misma más allá de duda razonable con "prueba satisfactoria y suficiente en derecho, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido".

Erró el juzgador de los hechos y el Tribunal de Primera Instancia al declarar la culpabilidad del apelante sin que se estableciera más allá de duda razonable la conexión de éste con los delitos imputado[s].

Erró el Jurado al encontrar culpable al apelante cuando la prueba presentada por la fiscalía era conflictiva e insuficiente para derrotar la presunción de inocencia que existe a todo imputado de delito y para sostener una convicción, ya que las omisiones, contradicciones y evidencia inverosímil presentada en el caso eran suficientes para crear duda razonable.

El 17 de abril de 2024, intimamos *Resolución* en la cual concedimos un término de siete (7) días al señor VÁZQUEZ LEBRÓN para informar el método de reproducción de la prueba oral. Entonces, el 12 de mayo de 2025, pronunciamos *Resolución* acogiendo la transcripción de la prueba oral y reiterando los plazos concedidos al señor VÁZQUEZ LEBRÓN y a EL PUEBLO DE PUERTO RICO para presentar sus respectivos alegatos haciendo referencia a las porciones de la transcripción de la prueba oral relevantes a su(s) señalamiento(s) de error(es). Concedida una prórroga, el 23 de julio de 2025, el señor VÁZQUEZ LEBRÓN presentó su *Alegato del Apelante.* Aprobado un aplazamiento, el 26 de septiembre de 2025, EL PUEBLO DE PUERTO RICO presentó su *Alegato de El Pueblo de Puerto* Rico.

Evaluado concienzudamente el expediente del caso; contando con el beneficio de la comparecencia de ambas partes y habiéndole dado la debida consideración a la transcripción de la prueba oral, nos encontramos en posición de adjudicar. Puntualizamos las normas de derecho pertinentes a las controversias planteadas.

## - II -

### - A - *PRESUNCIÓN DE VALIDEZ Y CORRECCIÓN; APRECIACIÓN DE LA PRUEBA*

Una vez la parte apelante interpone su recurso, ello suspende la ejecución de la *Sentencia* únicamente cuando el foro primario o este foro revisor haya fijado una fianza en la apelación y esta haya sido presentada, tras haber escuchado al Ministerio Público.[109]

Las sentencias dictadas por los tribunales tienen a su favor una presunción de validez y corrección.[110] Ello esta cimentada sobre una base muy importante pues reconoce el hecho real de que el juez observa los testigos mientras declaran y dirime su credibilidad.[111] En otras palabras, el juez de instancia puede percibir elementos que no pueden ser concebidos mediante documentos y una transcripción de la prueba.[112]

Asimismo, la Regla 110 de Evidencia instituye que "será el juzgador de hechos quien deberá evaluar la prueba presentada con el propósito de determinar cuáles hechos fueron establecidos o demostrados".[113] En virtud de ello, es un criterio reiterado que cuando se le suplica a un foro apelativo que revise cuestiones de hechos, la *apreciación de la prueba*, en primera instancia, le corresponde al foro sentenciador dado que estos tienen la oportunidad de observar y oír a los testigos, y por ello, están en mejor posición de evaluarla.[114] En ese marco, la evaluación del foro sentenciador merece respeto y deferencia.[115]

Cónsono con ello, por lo general, "los tribunales apelativos no intervenimos ni alteramos innecesariamente las determinaciones de hechos que hayan formulado los tribunales de primera instancia luego de admitir y aquilatar la prueba presentada durante el juicio".[116] Por lo tanto, no debemos

---

[109] S. Steidel Figueroa, et. al, *Perspectivas en la Práctica Apelativa*, Ediciones SITUM 2018, págs. 10-12.
[110] *López García v. López García*, 200 DPR 50, 59 (2018).
[111] S. Steidel Figueroa, *supra*, pág. 102.
[112] *Íd.*
[113] 32 LPRA Ap. VI.
[114] *Pueblo v. Acevedo Estrada*, 150 DPR 84, 98-99 (2000); *López Vicil v. ITT Intermedia, Inc.*, 142 DPR 857, 865 (1997).
[115] *González Hernández v. González Hernández*, 181 DPR 746, 776 (2011).
[116] *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 65 (2009).

descartar las determinaciones "tajantes y ponderadas del foro de instancia" y sustituirlas por nuestra propia apreciación, a base de un examen del expediente del caso.[117] Consiguientemente, los foros apelativos podremos intervenir con la *apreciación de la prueba* cuando exista error manifiesto, pasión, prejuicio, parcialidad o cuando un análisis integral, detallado y minucioso de la prueba así lo justifique.[118] Solo ante la presencia de estos elementos y/o cuando la *apreciación de la prueba* no concuerde con la realidad fáctica o esta sea inherentemente imposible o increíble, habremos de intervenir con la apreciación efectuada.[119] Esto sin olvidar que "la intervención indiscriminada con la adjudicación de credibilidad que se realiza a nivel de instancia significaría el caos y la destrucción del sistema judicial existente en nuestra jurisdicción".[120] El peso para rebatir la presunción de corrección que tienen las actuaciones de los tribunales de instancia le corresponde a la parte que la cuestiona.[121]

En consonancia con dichos principios, la Regla 19 del *Reglamento del Tribunal de Apelaciones*, dispone, en lo pertinente, que "[c]uando la parte apelante haya señalado algún error relacionado con la suficiencia de la prueba testifical o con la apreciación errónea de ésta por parte del tribunal apelado, deberá reproducir la prueba oral de conformidad con lo dispuesto en la Regla 76 de este Reglamento".[122] Sobre ese particular, en *Hernández v. San Lorenzo Const.*, el Máximo Foro concluyó que, debido a que las determinaciones de hecho que hace el Tribunal de Primera Instancia merecen deferencia, por la oportunidad que tuvo el juzgador de los hechos de observar y escuchar a los testigos, **la intervención del foro apelativo**

---

[117] *Íd.*, págs. 65- 66.
[118] *Pueblo v. Negrón Ramírez*, 213 DPR 895 (2024); *Pueblo v. Casillas, Torres*, 190 DPR 398, 426 (2014); *González Hernández v. González Hernández, supra*, pág. 777; *Pueblo v. Maisonave*, 129 DPR 49 (1991).
[119] *Pueblo v. Acevedo Estrada, supra.*
[120] *Pueblo v. Toro Martínez*, 200 DPR 834, 859 (2018).
[121] *Pueblo v. Prieto Maysonet*, 103 DPR 102, 107 (1974).
[122] Regla 19 del Reglamento del Tribunal de Apelaciones, *In re Aprob. Enmdas. Reglamento TA*, 2025 TSPR 141, pág. 37, 216 DPR __ (2025).

**con esa prueba tiene que estar basada en un análisis independiente de la prueba desfilada y no a base de los hechos que exponen las partes.**[123]

### - B - *DUDA RAZONABLE*

La Sec. II del Art. II de la Constitución de Puerto Rico contempla como un imperativo que, en todo proceso criminal, el acusado disfrute del derecho a la *presunción de inocencia*.[124] Tal presunción es un principio consagrado del derecho penal.[125] Para rebatirla, el ordenamiento jurídico precisa la presentación de evidencia que compruebe la culpabilidad del acusado más allá de duda razonable. De este modo, el peso de la prueba recae en el Estado, quien deberá presentar evidencia sobre la existencia de todos los elementos del delito y su conexión con el acusado. Aun así, la culpabilidad del acusado no tiene que probarse con certeza matemática. Se exige que se presente prueba satisfactoria y suficiente en derecho, lo que significa que produzca certeza o convicción moral en una conciencia exenta de preocupación y en un ánimo, no prevenido.[126]

Como resultado, la *duda razonable* no es especulativa o imaginaria y tampoco es cualquier duda posible. Se trata de aquella duda fundada, producto de raciocinio de todos los elementos de juicio envueltos en el caso. La *duda razonable* no es otra cosa que la insatisfacción en la conciencia del juzgador con la prueba presentada.[127] Es un principio fundamental de antiquísima estirpe.[128]

### - C - *DELITOS*

En el *Código Penal de Puerto Rico de 2012* existen múltiples delitos tipificados, estos se dividen en delitos graves o menos graves.[129] En lo pertinente al caso ante nuestra consideración, corresponde adentrarnos en los delitos por los cuales hubo una convicción. El delito de *asesinato* está

---

[123] 153 DPR 405, 425 (2001). (énfasis nuestro).
[124] LPRA, Tomo 1.
[125] E. Batista Ortiz, *Leyes Penales Especiales Sumario Práctico*, Ediciones SITUM (2015), pág. 26.
[126] *Pueblo v. Toro Martínez*, 200 DPR 834, 855-856 (2018).
[127] *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002).
[128] E. Batista Ortiz, *supra*, pág. 26.
[129] Ley Núm. 146 de 30 de julio de 2012, según enmendada. 33 LPRA § 5001.

comprendido en el Artículo 92 de *Código Penal de Puerto Rico de 2012*, el cual se define como:

> "...dar muerte a un ser humano a propósito, con conocimiento o temerariamente".[130]

En lo concerniente, la tratadista Dora Nevárez-Muñiz dilucida:

> Es asesinato en primer grado toda muerte causada a propósito o con conocimiento; ya no será necesario probar el elemento de la premeditación (definido como la deliberación previa a la resolución de matar). Esto relaja los requisitos para probar el asesinato en primer grado, y hace más inteligible la instrucción que se imparta al jurado sobre el elemento mental.[131]

El delito de *asesinato en primer grado* tiene varias modalidades y están contenidas en el Artículo 93. En específico, el inciso (d) previene:

> "Todo asesinato causado al disparar un arma de fuego desde un vehículo de motor, o en un lugar público o abierto al público, ya sea a un punto determinado o indeterminado."[132]

En cambio, la Ley Núm. 168 de 11 de diciembre de 2019, según enmendada, mejor conocida como la *Ley de Armas de Puerto Rico de 2020*, fue creada con el propósito de tomar acción y promover un estatuto que salvaguardara y protegiera los derechos de los ciudadanos americanos residentes en Puerto Rico, y, a su vez, fuera consistente con la Segunda Enmienda de la Constitución de los Estados Unidos y con las decisiones del Tribunal Supremo federal.[133] Asimismo, la intención de esta *Ley* es dejar claro que, en Puerto Rico, el portar y poseer armas de fuego es un derecho fundamental e individual, al igual que en el resto de la Nación.

En relación con los delitos imputados en este caso, debemos hacer referencia al Artículo 6.05, que dispone lo siguiente:

> **Artículo 6.05.** – Portación, Transportación o Uso de Armas de Fuego sin Licencia:
> Toda persona que porte, transporte o use cualquier arma de fuego, sin tener una licencia de armas vigente, salvo lo dispuesto para los campos de tiro o lugares donde se practica la caza, incurrirá en delito grave y convicto que fuere, será sancionada con pena de reclusión por un término fijo de diez (10) años, sin derecho a sentencia suspendida, o a disfrutar de los beneficios de algún programa de desvío, o a cualquier alternativa a la reclusión

---

[130] 33 LPRA § 5141.
[131] D. Nevárez-Muñiz, *Código Penal de Puerto Rico comentado*, 4a ed. rev., San Juan, Instituto para el Desarrollo del Derecho, Inc., 2019, pág. 155.
[132] 33 LPRA § 5142.
[133] 25 LPRA § 461-467. Véase, *Exposición de Motivos* de la Ley Núm. 168-2019.

reconocida en esta jurisdicción. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de veinte (20) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de cinco (5) años.
No obstante, cuando se trate de una persona que (i) esté transportando o portando un arma de fuego que está registrada a su nombre, (ii) tenga una licencia de armas expedida a su nombre que está vencida, (iii) no se le impute la comisión de cualquier delito grave que implique el uso de violencia, (iv) no se le impute la comisión de un delito menos grave que implique el uso de violencia, y (v) el arma de fuego transportada o portada no esté alterada ni mutilada, dicha persona incurrirá en un delito menos grave y, a discreción del Tribunal, será sancionada con una multa que no será menor de quinientos (500) dólares ni mayor de cinco mil dólares ($5,000) o pena de cárcel que no excederá de seis (6) meses.[134]

De igual forma, el Artículo 6.09 de la *Ley*, instaura:

**Artículo 6.09.** – Portación, Posesión o Uso Ilegal de Armas Largas Semiautomáticas, Automáticas o Escopeta de Cañón Cortado.
Toda persona que porte, posea o use sin autorización de esta Ley un arma larga semiautomática, una ametralladora, carabina, rifle, así como cualquier modificación de estas o cualquiera otra arma que pueda ser disparada automáticamente o escopeta de cañón cortado a menos de dieciocho (18) pulgadas, y que pueda causar grave daño corporal, o cualquier pieza o artefacto que convierte en arma automática cualquier arma de fuego, incurrirá en delito grave, y convicta que fuere será sancionada con pena de reclusión por un término fijo de veinticuatro (24) años, sin derecho a sentencia suspendida, o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o a cualquier alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de treinta y seis (36) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de dieciocho (18) años. No constituirá delito la posesión o uso de estas armas en el cumplimiento del deber por los agentes del Negociado de la Policía o por otros agentes del orden público debidamente autorizados. Tampoco constituirá delito la posesión o uso de estas armas según permitido en otros Artículos de esta Ley.

## - III -

El señor VÁZQUEZ LEBRÓN enuncia ocho (8) señalamientos de error. En estos, cuestiona la *apreciación de la prueba* y la suficiencia de esta para probar *más allá de duda razonable* su culpabilidad con relación a los delitos imputados.

Plantea el señor VÁZQUEZ LEBRÓN que la *Sentencia* impugnada dictada en su contra el 15 de marzo de 2024, es contraria a derecho. Toda vez que los testimonios vertidos para récord por los señores Christopher Rodríguez

---

[134] 25 LPRA § 466d.

Ortíz, Alexander Lugo Collazo y el agente Carlos M. León Vázquez fueron poco confiables y contradictorios. Por tanto, EL PUEBLO DE PUERTO RICO no logró presentar evidencia suficiente para probar todos los elementos de los cargos atribuidos y su conexión con el señor VÁZQUEZ LEBRÓN para comprobar su culpabilidad. Inclusive, discierne que EL PUEBLO DE PUERTO RICO suprimió evidencia exculpatoria que impidió que se le garantizara su derecho constitucional a un juicio justo e imparcial.

Por su parte, EL PUEBLO DE PUERTO RICO asegura que evidenció con prueba pericial, demostrativa, real y testimonial, la participación del señor VÁZQUEZ LEBRÓN en el asesinato del occiso Ónix Vigilio Cora Vicioso. Pondera que los señalamientos de error del señor VÁZQUEZ LEBRÓN concernientes a las supuestas contradicciones entre los testimonios vertidos o sobre la presunta deficiencia de la investigación del agente León Vázquez, son irrelevantes e insuficientes para alterar la determinación de culpabilidad que el Jurado realizó correctamente. Completó que la determinación del Jurado goza de una presunción de corrección y la carga probatoria para probar que se incurrió en pasión, prejuicio, parcialidad o error manifiesto en la *apreciación de la prueba* recaía sobre el señor VÁZQUEZ LEBRÓN.

Conforme nuestro ordenamiento jurídico, todo acusado ostenta el derecho a impugnar mediante apelación la sentencia penal recaída en su contra. En el ejercicio de nuestra función revisora, nos corresponde aquilatar los señalamientos de error formulados por el señor VÁZQUEZ LEBRÓN, lo que exige examinar la suficiencia de la prueba o evidencia presentada y desfilada ante el foro de instancia, así como los errores de derecho imputados, a los fines de auscultar si la convicción puede sostenerse en estricto derecho.

En primer orden, en este caso, debemos destacar que los fallos de culpabilidad se sostienen ampliamente en la totalidad de la prueba desfilada. Del mismo modo, estamos obligados a dar gran deferencia a la apreciación de dicha prueba por el foro primario, así como a su adjudicación de

credibilidad y sus determinaciones de hechos, especialmente las que se basan en prueba oral.[135] Veamos.

De conformidad con el testimonio vertido para récord por el señor Rodríguez Ortíz, se desprende un cuadro probatorio convincente que ubica al señor **VÁZQUEZ LEBRÓN**, en el lugar de los hechos, específicamente, disparando un arma de fuego Glock 40-22 de color negro y azul marino, desde un vehículo Mitsubishi Mirage cuatro puertas, color verde aqua con bonete negro en dirección a las personas que se encontraban en la barbería/*carwash* ubicada en Guayama, el 22 de febrero de 2020. Igualmente, y en lo pertinente, que en conjunto y común acuerdo con el señor **VÁZQUEZ LEBRÓN**, planificaron darle muerte a "Toñito" y a "Killer" luego de ubicarlos en la barbería/*carwash*, minutos antes. Ambos fueron a la residencia del Rodríguez Ortíz, localizada en Chunchín, donde buscaron un rifle R-15 y regresaron a la barbería/*carwash*. Empero, el señor **VÁZQUEZ LEBRÓN** terminó asesinando, a propósito, y con conocimiento, a una tercera persona que, no sabían quién era, sino que se encontraba allí esperando por su progenitor, quien se encontraba en el negocio frente a la barbería/*carwash*. Emerge de los testimonios de los señores Rodríguez Ortíz y Lugo Collazo que el señor **VÁZQUEZ LEBRÓN**, al ser cuestionado sobre la razón por la cual ultimó a la víctima, Ónix Vigilio Cora Vicioso, este respondió que se debía a la adrenalina que tenía en ese momento y para dejar saber que los que mandaban allí eran ellos.

Aún más, el señor Lugo Collazo corroboró que, en efecto, recibió una llamada por parte del señor Rodríguez Ortíz para que lo esperara en la fábrica; al esperar allí unos doce (12) a quince (15) minutos vio llegar un carro Mitsubishi Mirage verde cuatro puertas, con bonete negro, del cual se bajaron los señores Rodríguez Ortíz y **VÁZQUEZ LEBRÓN**, vestidos de negro y ambos armados (Rodríguez Ortíz con el rifle y una pistola negra, y **VÁZQUEZ**

---

[135] *Pueblo v. Negrón Ramírez*, 213 DPR 895, 910 (2023); *Pueblo v. Rivera Montalvo*, 205 DPR 352, 373 (2020).

LEBRÓN con una pistola negra y azul marino); VÁZQUEZ LEBRÓN llevaba unos guantes que aparentaban estar manchas de sangre; dispusieron de la ropa que llevaban puesta por orden de Rodríguez Ortíz; y, reconoció las armas que fueron encontradas, toda vez que solía verlas en posesión de Rodríguez Ortíz y VÁZQUEZ LEBRÓN en el punto de drogas.

Los testimonios confirman que, en efecto, quien causó la muerte de la víctima Ónix Vigilio Cora Vicioso fue el señor VÁZQUEZ LEBRÓN. Si bien parte de la prueba presentada es de naturaleza circunstancial, la misma permite inferir razonablemente el elemento subjetivo requerido para la configuración del delito de *asesinato en primer grado*. El señor VÁZQUEZ LEBRÓN no ofreció coartada alguna que evidenciara que no se encontraba en la escena donde ocurrieron los hechos o en el vehículo que se utilizó para asesinar a la víctima Ónix Vigilio Cora Vicioso frente a la barbería/*carwash*, o pudo impugnar o refutar la credibilidad de los testigos.

En relación a las incongruencias que alega el señor VÁZQUEZ LEBRÓN sobre los testimonios ofrecidos en el juicio en relación a: la razón por la cual los señores Rodríguez Ortíz y VÁZQUEZ LEBRÓN tenían problemas con "Toñito"; el color de los guantes utilizados; la hora en que pasó el vehículo por primera vez por el lugar de los hechos; si el señor Rodríguez Ortíz tenía el arma al momento de pasar por primera vez por la barbería/*carwash*; la manera en la que se dispuso de la ropa que llevaban puesta ese día; y, la cantidad de disparos que se hicieron con el rifle, no constituyen, por sí solas, una violación al debido proceso de ley atribuible a EL PUEBLO DE PUERTO RICO, sino un asunto de credibilidad, cuya valoración correspondía, en primera instancia, al tribunal sentenciador. El Tribunal de Primera Instancia, por su contacto directo con la prueba, se encontraba en mejor posición para aquilatar la veracidad y confiabilidad de los testigos, por lo que resulta forzoso otorgarle deferencia.

A la luz de lo anterior, este Tribunal debe concluir que la evidencia desfilada, así como todos los testimonios vertidos para récord son suficientes

en derecho para rebatir la presunción de inocencia y acreditar, más allá de duda razonable, la responsabilidad penal del señor VÁZQUEZ LEBRÓN en la comisión del asesinato de Ónix Vigilio Cora Vicioso.

En conclusión, la evidencia que surge del expediente ante nuestra consideración, en unión a los autos originales, demuestra la inexistencia de error manifiesto, pasión, prejuicio, parcialidad en la *apreciación de la prueba* por parte del Tribunal de Primera Instancia; y no existió violación alguna al debido proceso de ley, ni inconsistencias de naturaleza constitucional que vicien la validez del fallo condenatorio del señor VÁZQUEZ LEBRÓN.

- IV -

Por los fundamentos antes expuestos, **confirmamos** la *Sentencia* decretada el 15 de marzo de 2024 por el Tribunal de Primera Instancia, Sala Superior de Guayama.

**Notifíquese inmediatamente.**

Lo acordó el Tribunal y lo certifica la Secretaría del Tribunal de Apelaciones.

La Jueza Santiago Calderón concurre con el resultado mediante voto escrito.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

## ESTADO LIBRE ASOCIADO DE PUERTO RICO
### TRIBUNAL GENERAL DE JUSTICIA
### TRIBUNAL DE APELACIONES
### PANEL ESPECIAL

| | | |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br><br>v.<br><br><br><br>MICHAEL VÁZQUEZ LEBRÓN<br><br>Apelante | KLAN202400375 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Guayama<br><br>Caso Núm.:<br>GLA2021G0010<br>GLA20210076-77 (308)<br><br>Sobre:<br>Art. 93(d) CP; 6.05 y 6.09 LA |

Panel integrado por su presidenta, la Juez Lebrón Nieves, la Juez Barresi Ramos y la Jueza Santiago Calderón

### VOTO PARTICULAR CONCURRENTE
### DE LA JUEZA SANTIAGO CALDERÓN

En San Juan, Puerto Rico, a _30_ de abril de 2026.

En la apelación presentada por el señor Michael Vázquez Lebrón (apelante), se argumentan ocho (8) errores, los cuales se pueden agrupar en dos errores.

En primer lugar, el apelante esboza que erró el TPI, y por ende el jurado, al encontrarlo culpable -ya que el Ministerio Público no probó el caso más allá de duda razonable- condenándole así sin haber celebrado un juicio justo e imparcial. En segundo término, señala que los testimonios de los testigos principales fueron inconsistentes, contradictorios y sobre asuntos medulares. Además, arguye que también se excluyó prueba testifical que redundaría en prueba exculpatoria, y que el testimonio del coautor, Christopher Rodríguez, no fue examinado por el jurado con desconfianza.

Este voto aborda la discusión de los errores agrupados en el segundo término. Así pues, el apelante alega que en el testimonio del coautor Christopher Rodríguez, hubo aproximadamente sesenta (60) contradicciones, así como en el testimonio de Alexander Lugo hubo cincuenta y uno (51), y en el testimonio del agente Carlos M. León Vázquez, en ochenta y un (81) ocasiones.

Tras revisar minuciosamente la transcripción de la prueba oral, es mi opinión que algunas de las contradicciones expuestas por el apelante ocurrieron durante el testimonio de los testigos mencionados previamente. Al revisar el testimonio del coautor Christopher Rodríguez, es mi entender que fue debidamente impugnado, así surge de la lectura de la transcripción de la prueba oral al brindar versiones distintas, lo que le llevó a admitir en el juicio en su fondo que se encontraba confundido cuando se le confrontaba sobre declaraciones juradas previas y testimonio durante el juicio[1].

Con la misma suerte corrió el testimonio de Alexander Lugo, quien dio versiones encontradas[2] entre sí y diferentes. Cabe destacar que, al momento de celebrarse el juicio, el coautor Christopher Rodríguez no había sido procesado criminalmente relacionado a los hechos del caso ante nuestra atención y a Alexander Lugo no se le presentaron cargos, aun cuando participó en etapas posteriores al asesinato de la víctima inocente.

Ahora bien, aun cuando exponemos la particularidad de dichos testimonios inconsistentes, cabe preguntarnos si esa impugnación conlleva la revocación del veredicto de culpabilidad emitido por el jurado.

Obsérvese que, la Regla 156 de las de Procedimiento Criminal[3], establece que "[e]l testimonio de un coautor o del cooperador será examinado con desconfianza y se le dará el peso que estime el juez o el jurado luego de examinarlo con cautela a la luz de toda la evidencia presentada en el caso. En los casos celebrados por jurado se le ofrecerán al jurado instrucciones a esos efectos". No obstante, debemos aclarar que, la Regla 156 de las de Procedimiento Criminal, *supra*, debe leerse en conjunto con la Regla

---

[1] Transcripción de la prueba, págs. 55, 75, 92, 96, 97, 98, 99, 101-104.
[2] Transcripción de la prueba, págs. 113, 114 - 116, 150, 161- 166, 177–181.
[3] 34 LPRA Ap. II, R. 156.

137, también de las de Procedimiento Criminal[4]. Ello es así debido a que, si bien es cierto que la Regla 156 de las de Procedimiento Criminal, *supra*, establece una instrucción al jurado sobre el testimonio de coautores, la Regla 137 de las de Procedimiento Criminal, *supra*, establece las consecuencias de no efectuar una oportuna solicitud a esos efectos. Nos dice la referida regla que "ninguna de las partes podrá señalar como error cualquier porción de las instrucciones u omisión en las mismas a menos que planteare su objeción a ellas...". Sobre este particular, al revisitar los autos originales, surge de la *Minuta*[5] que el TPI *repasó con las partes las instrucciones que serían impartidas al jurado al momento de la deliberación, el abogado de la defensa objetó el informe de ratificación donde se menciona que el apelante había recibido un beneficio, lo cual no era cierto; y se instruyó al jurado al respecto*[6] . No surge de los autos originales ni de la TPO si el TPI dio la instrucción correspondiente al coautor, es en el alegato en oposición presentado por la Oficina del Procurador General que, efectivamente, se menciona que se *dieron las instrucciones al jurado respecto a que los testimonios de coautores deben evaluarse con cautela, conforme a lo dispuesto en la Regla 156 de las de Procedimiento Criminal, supra, y aun así el Jurado decidió conferirle credibilidad.*

En vista de ello, no procede nuestra intervención con la apreciación y adjudicación de credibilidad que hizo el jurado en el caso de autos.

Referente al testimonio del agente Carlos M. León Vázquez, el apelante alegó que la investigación fue amañada por la exclusión de prueba exculpatoria y de los testimonios del señor José Cotto Cosme y de Toñito. No obstante, un panel hermano[7] resolvió que la alegada

---

[4] 34 LPRA Ap. II, R. 137.
[5] Minuta del 22 de enero de 2024. Minuta del 23 de enero de 2024 donde se imparten las instrucciones al jurado.
[6] *Íd.*
[7] KLCE202201037.

prueba exculpatoria *no era evidencia material o relevante para demostrar su inocencia* y tampoco contradecía la prueba de cargo sobre los hechos esenciales por los cuales fue acusado. Ello, toda vez que el contenido de las notas *no versaba sobre los elementos del delito y tampoco sobre si el peticionario cometió o no el delito.* Coincido con dicha determinación.

Es norma reiterada por nuestro Tribunal Supremo que, al enfrentarnos con la tarea de revisar cuestiones relacionadas a convicciones criminales, siempre nos regimos por la norma de autolimitación que establece que esta curia intermedia debe otorgar deferencia al foro primario cuando realiza determinaciones sobre la apreciación de la prueba. Ello se debe a que *el jurado es el más indicado para otorgar credibilidad y dirimir conflictos de prueba. Son estos quienes normalmente están en mejores condiciones de aquilatar la prueba, pues gozan de la oportunidad de ver y escuchar directamente a los testigos*[8].

Cabe destacar que el jurado escuchó los testimonios, las posibles incongruencias o insuficiencias que uno pudiese apreciar en los testimonios vertidos por el coautor Christopher Rodríguez, Alexander Lugo y el agente Carlos M. León Vázquez, sin embargo, en unión al monto del resto de la prueba, adjudicó la credibilidad, de dichos testimonios, por lo cual, determinó que fue una decisión que cae dentro de su discreción como juzgador de los hechos.

Ante ello y por los fundamentos expresados, coincido con la decisión del Panel de confirmar la *Sentencia* apelada.

Grisel M. Santiago Calderón
Jueza de Apelaciones

---

[8] *Pueblo v. Ruiz Ramos*, 125 DPR 365, 400-401 (1990), citando a *Pueblo v. Pellot Pérez*, 121 DPR 791 (1988). Véase, además, *Pueblo v. Rosario Reyes, supra*, págs. 598-599.